## COOLIDGE AND OLIVER *against* THE NEW-YORK FIREMEN INSURANCE COMPANY.

A copy of the register of a vessel, certified to be a true copy by the collector, is not, on proof of the handwriting of the collector, evidence to show the interest of the insured, or a compliance with the warranty of *American* property, in a policy of insurance; but as the collector has only authority to grant a copy to accompany the vessel, and not to grant copies generally, a copy given in evidence on the trial of a cause, must be authenticated in the usual way, that is, by the oath of a witness who has compared it with the original.

A warranty that a ship is *American* property imports not merely that she is *American*, but that she should be accompanied with the documents requisite to show her national character.

A vessel was insured and warranted *free from loss by the British or Americans*, but in case of capture by either, the usual sea risks to continue, and was captured by the *British*, and whilst detained by them, is lost in consequence of the negligence of the captors: it was held, that if the loss had arisen from a sea risk, strictly speaking, the insurer would have been liable, but that as the immediate and proximate cause of the loss was an act of the captors, which if done by the insured, would have exonerated the insurer, the insurer was in this case protected by the warranty.

THIS was an action of *assumpsit* on a policy of insurance, on the ship *Mark & Abigail*, on a voyage from *Boston* to *Cadiz*, underwritten by the defendants. The cause was tried before Mr. Justice *Platt*, at the *New-York* sittings, in *December*, 1816.

The policy was in the usual form of printed policies in the city of *New York*, in which the ship was valued at 8,000 dollars, at four and a half per cent premium, and warranted *American* property. The following written memorandum was subjoined :—" Also warranted free from loss by the *British* or *Americans*, but in case of capture or detention by either of the above named powers, the *usual peace sea-risks*, including capture by the *French* and *Algerines*, to continue as well during capture, as after and before ; it is agreed that this policy shall endure until the cargo shall be landed." On this policy the defendants underwrote 6,000 dollars.

The declaration contained two counts in the usual form ; in one the loss was averred, as follows :—" Before the arrival of the said vessel at *Cadiz* aforesaid, and in the due course of the said voyage, the said vessel was, upon the high seas, near cape *St. Mary's*, taken and carried as prize into the port of *Gibraltar*, by the *British* brig, or vessel of war, called the *Basilisk*, George French, commander ; that the said vessel, whilst at *Gibraltar* aforesaid, was by force and violence of the winds

and waves, and by stormy and tempestuous weather, strained, broken, damaged, wrecked, and spoiled, by means whereof she was totally lost." The second count averred the loss to have happened, whilst the vessel was on the voyage insured, by perils of the sea. Among the preliminary proofs which were exhibited, none of which were objected to *as* preliminary proofs, was a paper purporting to be a register of the vessel, dated the 4th of *April*, 1812, granted by the custom-house at the port of *Boston* and *Charlestown*, which was accompanied by a certificate, dated the 3d of *May*, 1814, under the hands of *H. A. S. Dearborn*, collector, and *James Lovell*, naval officer, and the seal of office, certifying that the within was a true copy of the register of the ship *Mark & Abigail*, as recorded in that office ; that her certificate of registry, with which she cleared out at the office for *Cadiz*, on the fourth day of *December*, 1812, was also a true copy of the same record, and that no change or transfer of the property in the vessel had been made at the office since the period of the clearance aforesaid.

The ship *Mark & Abigail* sailed on the voyage insured, on the 12th of *December*, 1812, with a cargo consisting of salted provisions, bread stuff, and lard, and was, at the time of her sailing, tight, staunch, and strong, and sufficiently fitted for the voyage. On the 20th of the month, a violent gale commenced, and there being a very heavy sea, the ship laboured much, and leaked to that degree that it was impossible to keep her free with pumps going, the water gaining two feet in the hold. It was considered necessary to lighten the vessel, and part of the cargo was, therefore, thrown overboard. The gale continued until the 30th, during all which time the ship was occasionally lightened by throwing over the cargo, and what was thrown over amounted to about one third part of the whole. After the gale had subsided; the ship still continued to leak badly, and the pumps were kept going almost continually. She continued on her course for *Cadiz* until the 24th of *January*, when she was captured by the *British* brig *Basilisk*, a prize master put on board, all hands except the captain, supercargo, mate, and cook, were taken out, and the vessel was ordered for *Gibraltar*, where she arrived on the 27th of *January*, 1813. The ship was libelled in the vice-admiralty court, at *Gibraltar*, but was restored on payment of costs ; from this sentence the captors appealed, but about the 20th of *April*, the supercargo

ALBANY,
August, 1817.

COOLIDGE
v
THE NEW-YORK
FIREM. INS. CO

compromised with the captors, and she was liberated on the payment of 1,000 dollars. From her arrival at *Gibraltar*, to this time, the captain, supercargo, and crew had not been allowed to go on board : when they came on board after her liberation, she was found to have been very much injured while in the possession of the captors, and was a mere wreck. She had been moored at the new mole in the bay of *Gibraltar*, a situation very much exposed, between other vessels, which had often run foul of her. On the 23d of *April*, a survey was had of the vessel, by two shipmasters and one ship carpenter, who computed the cost of repairing her, at 7,458 dollars. It was stated in the depositions of the master and supercargo, that it would have been very difficult and expensive, if not impracticable, to have repaired her at *Gibraltar*, (but there was contradictory testimony as to this point,) and that it would have been dangerous to have proceeded in her from *Gibraltar* to *Cadiz*. She was then taken to *Algeziras*, in the neighbourhood of *Gibraltar*, when the cargo was taken out, and both vessel and cargo were sold. The purchasers of the vessel intended her for a store-ship, but she was broken up for fuel. It appeared that it would have been more difficult and expensive to have made the repairs at *Algeziras* than at *Gibraltar*.

During the trial, the plaintiffs called a witness to prove the handwriting of *Dearborn*, the collector of *Boston*, to the before-mentioned copy of the register of the vessel, and having proved it, offered to read it as evidence, in chief, to support the averment of interest in the plaintiffs, and the warranty of *American* property. This was objected to on the part of the defendants, but it was admitted as evidence by the judge. The defendants counsel then moved for a nonsuit, on the ground that the plaintiffs had failed to give sufficient proof of interest, but the motion was denied.

A verdict was found, by consent, for the plaintiffs, as for a total loss, subject to a case to be made for the opinion of the court thereon.

*Colden*, for the plaintiffs. The plaintiffs are entitled to recover for a total loss. The policy is in the usual form, except that the insurers, " in case of capture, or detention, by the *British* or *Americans*, take upon themselves the usual peace *sea-risks*. Then what is meant by the usual peace sea-risks? They

ALBANY,
August 1817.

COOLIDGE
v
THE NEW-YORK
FIREM. INS. Co.

are those perils which are produced by the elements without the intervention of human force, including, in this case, capture by the *French* and *Algerines.* War sea-risks are those which result from hostile force. It will be said, perhaps, that the damage, or loss, in this case, resulted from a war sea-risk, inasmuch as the vessel was put in a situation in which she would not have been placed, had it not been for the capture. But this could not be the meaning of the defendants, by the clause in the policy, as they had in view a capture, and provided, in that event, that they were to be answerable only for peace sea-risks. When a vessel, insured by a limited policy, is led by a peril, not insured against, into a situation in which she encounters one of the perils against which she is insured, the underwriters are liable.*

Again; if the vessel, on her arrival at *Gibraltar*, was irreparable from the injuries previously received in her voyage, then the insured are entitled to recover on that ground, independently of the damage she afterwards sustained at *Gibraltar.* The depositions taken in the case, show that there were no means of repairing her at *Gibraltar*, and she was broken up at *Algeziras.* [The counsel then went into particular examination of the evidence.] If the vessel could not be repaired, either for want of means, or from any other cause, so as to enable her to reach *Gibraltar*, there was a loss of voyage, which is a sufficient cause of abandonment.

It will, perhaps, be objected that the *warranty* has not been proved. It is a written warranty of *American property;* not that the vessel is an *American* ship. *Ownership*, or *property*, in a vessel, may be proved by *parol;* and *Cook*, in his deposition, proves that the vessel belonged to the plaintiffs. Exercising acts of ownership in directing the loading of a ship, &c. has been held, *prima facie*, sufficient proof of ownership in a vessel.† In *Barker* v. *The Phœnix Insurance Company*,‡ it was held, that where a vessel sailed with a *sea-letter* only, that was sufficient evidence of her being an *American*, without producing a *register;* and it was admitted by the counsel for the defendants, in that case, that mere *ownership* might be proved by parol.

The document produced in this case, was not properly a copy of the *register*, but a duplicate; the original register being deposited in the custom house. Where a public officer is empow-

* 4 Bos. & Pull.
181. Scott v.
Thompson.. 2
Johns. Rep. 89.
96, Robinson v.
Mar. Ins. Co.
Green v. Elmslie,
Peak N. P. 212

† Amery v. Rogers, 1 Esp. Rep.
208. Robertson v.
French, 4 East.
Rep. 130 Peak.
547. Marshall,
709, 710, 711,
712. 1 Term
Rep. 205.
‡ 8 Johns. Rep.
307.

ALBANY,
August, 1817.

COOLIDGE
v.
The New-York
Firem. Ins. Co.

ered to give copies, his official certificate to a copy, or dupli-
cate, *must be deemed sufficient,* especially in cases of this kind.

*S. Jones, jun.* and *Wells,* contra.    The meaning of the war-
ranty is, that the vessel is *American,* and so documented as to
support her national character as *American.*    To maintain this
warranty, the plaintiffs must show that she had such documents
on board as would maintain her *American* character.    They
produced a paper granted by the custom house, accompanied
with a certificate under the hands of the collector and naval offi-
cer, and the seal of office, that the paper was a copy of the re-
gister recorded in the office.    Proof of the handwriting of the
collector was the only evidence offered of this paper.    If the
register is matter of *record,* it must be proved, either by an ex-
emplification produced, or by the oath of a person who has
compared it with the original. ·  If the plaintiffs rely on the *seal,*
that should have been proved, as well as the handwriting.    It is
not the seal of a court, but of an officer.    If the paper was an
*original,* the proof was not sufficient, unless the court had judi-
cial knowledge of the seal.    If it is an exemplification, it must
be under seal, and that seal must be proved, or known to the
·court.    Office copies are evidence in the court to which the of-
fice belongs, and who is entrusted to make them out, but not in
another court; but a copy given by an officer, not intrusted for
the purpose, must be strictly and regularly proved, as in other
cases.*

As to the question on the merits of the case, we contend that the
plaintiffs have not complied with their warranty.  The general risks
are qualified by the warranty, and the policy is to be construed ac-
cording to the special agreement in writing.  This agreement
must mean something different from the printed words.  The de-
fendants contemplated a species of sea risk encountered in time of
war, but which is not encountered in time of peace; yet according
to the explanation given by the plaintiffs, there is no difference
between a peace and a war sea-risk.    If the risk experienced
during capture is not such a sea risk as she could have encoun-
tered *before,* or *after,* the capture, then it is not a peace sea-risk.
If, after capture, a storm had arisen, and the vessel had sunk,
it would have been a loss for which the defendants would have
been liable precisely as in time of peace.    But they are not re-
sponsible for any loss arising from the carelesness, negligence,

*Phillips' Law
of Ev. 291, 292.
4 Dallas, 415.*

or misconduct, of the captors. The exposed situation of the vessel, and the negligence of the captors were, in this case, the direct causes of the loss sustained. It was precisely against the perils arising from the known want of care in captors, that this clause was intended to guard the defendants. If other causes, arising out of war, are combined with sea-risks, they are not the hazards for which the insurers intended to be answerable.

But we contend that the loss, at *Gibraltar*, was not occasioned by a *sea*-risk at all, taking it in its broadest sense, without any qualification as to peace or war. If the vessel had gone to *Gibraltar* in the ordinary course of her trade, she would never have been placed in that exposed situation. If the captors had dismantled and cut up the vessel, that would not have been a sea-risk. The loss was not owing to the sea merely, but to the exposed situation in which she was placed by the captors. If a master does not properly moor his vessel in port, and a storm arises, by which she is injured, the underwriters are not liable for the loss.

Then, was the loss owing to the leak and other sea damage prior to her arrival at *Gibraltar?* The evidence in the case does not show that; but, on the contrary, that had it not been for the capture, she would have proceeded to *Cadiz.* From *Gibraltar* to *Cadiz*, with a fair wind, the passage is not more than 24 hours. The survey makes no mention of the leak. To regard that as the cause of loss was, clearly, an after-thought.

*Colden*, in reply, said, that in the construction of the policy, two kinds of sea-risks were to be considered; the one arising from the act of man, the other from the act of God. The latter is the *peace* sea-risk intended. Suppose the vessel when going into *Gibraltar*, had been fired upon by a fort and sunk; or, suppose another vessel had, by mistake, fired upon and sunk her, these acts would have been sea-risks. There is no evidence that this vessel was not placed in the same situation as all other prize vessels, and unless it can be shown that she was treated differently, and with peculiar neglect, the defendants are liable for the sea-risk.

SPENCER, J., delivered the opinion of the court. The points arising from the case, and to which the arguments of the counsel have been directed, are,

ALBANY,
August, 1817.

COOLIDGE
v.
THE NEW-YORK
FIREM. INS. CO.

ALBANY,
August . 1847.

COOLIDGE
v.
THE NEW-YORK
FIREM. INS. CO.

1. Upon the obligation of the assured to have the necessary documents on board, showing the national character of the vessel, and *whether there is legal proof that such documents were* on board at the time of the capture.

2. Upon the construction of the warranty, that in case of capture, or detention, by the *British* or *Americans,* the usual peace sea-risk was to continue, as well during capture as after and before ; and

3d. Upon the particular nature of the loss.

The warranty here is, that the ship was *American* property; and there can be no doubt that such warranty imports not merely that she should be *American* property, but that she should be accompanied, during the voyage, with all the accustomed and necessary documents evincing that character, and insuring respect to it as such, within the laws of nations. This point has been repeatedly and solemnly adjudged in this court. (*Blagge* v. *The New-York Insurance Company,* 1 *Caines' Rep.* 545.; and *Barker* v. *Phœnix Insurance Company,* 8 *Johns. Rep.* 307.) This is also the doctrine of the *English* courts. (5 *East's Rep.* 99. 398.)

Was this warranty complied with ? The plaintiffs gave in evidence a copy of the register, under the hands and seals of the collector and naval officer of the port of *Boston* and *Charlestown,* certified by them to be a true copy of the register of the ship *Mark* and *Abigail,* as recorded in that office ; and that the certificate of registry with which she was cleared for *Cadiz,* in *December,* 1812, was also a true copy of the record.

The 9th section of the act of congress of the 31st *December,* 1792, (Vol. 2, 131.,) requires the collector of the district, comprehending the port to which any ship or vessel shall belong, to make and keep a record or registry thereof, and to grant an abstract or certificate of such record or registry, in the form prescribed ; and the 10th section, after requiring the secretary of the treasury to prepare and transmit the forms of the certificate of registry, attested under the seal of the treasury, and the hand of the register, directs the certificates to be signed and sealed by the collector before they are issued, and to be countersigned by the naval officer, when there shall be one ; a copy of each of which shall be transmitted to the register, who is to cause a record to be kept of the same.

To prove the ownership of the vessel in the plaintiff, and to

show that she was documented as an *American* ship, it was proved, that the signature of Mr. *Dearborn* to the certificate of registry, was his handwriting. This evidence was objected to, but the objection was overruled, and the copy was read. The record required to be kept by the collector of the registry of ships or vessels, is such a one, that a copy of it, compared with the original by a witness who can testify to its being a true copy, would be good evidence of the facts it sets forth; (4 *Dallas*, 415.,) but I have strong doubt whether the copy produced here is entitled to be admitted in evidence upon the proof of the handwriting of the collector. He is authorized to grant an abstract or certificate; but this accompanies the vessel, and is delivered to the owner or master, and it is authenticated under the seal of the treasury, and the hand of the register of the treasury; the collector is not authorized to grant copies generally. Then the rule of law applies, which declares, that when an officer is not intrusted to make out a copy, and has no more authority than a common person, the copy must be proved in the strict and regular mode. (*Phillips' Law of Evid.* 292.) The proof of Mr. *Dearborn's* handwriting cannot alter the case, for if the copy was evidence, as emanating from a person entrusted for that purpose, it would require no other proof; and if he is not entrusted by law to give copies, proof of his hand would not verify the paper. Besides, here is no proof of the signature of the naval officer.

It would be proper, and it is certainly expected, that the court should pronounce an opinion on the merits of the case; and it is believed to be one of the first impression.

The insurers warrant the ship free from loss, by the *British*, or *Americans*, but in case of capture or detention by either the usual peace sea-risks are to continue. The case occurred of a capture by the *British*, and the question is, whether the loss of the vessel, or her irreparable condition, arose from a usual sea-risk during the capture.

We have decided, (*Robinson* v. *Marine Ins. Co.*, 2 *Johns. Rep.* 89.,) that where the insurance was against sea risks only, and a deviation from necessity had taken place, the deviation excused the assured, as well in such a case, as where the insurance was general. This decision was urged as applicable to this case, but it does not seem to me to be so. If, after the capture, the ship had been lost by a sea-risk, strictly speaking, un-

doubtedly the underwriters would be answerable; but if the immediate and proximate cause of the loss is attributable to an act on the part of the captors, which act, if done by the assured, would absolve the insurers from the loss, then I cannot but think the insurers would not be liable. This leads us to the evidence in the case; and I think it perfectly clear, that the loss is attributable to the mooring the vessel in a dangerous and exposed situation in the bay of *Gibraltar*, instead of bringing her into the harbour. Whilst in that situation, several vessels ran foul of her, and she was exceedingly injured. The survey, which has been given in evidence, calculates the expense of repairs exclusively on injuries received whilst she was thus exposed; and I think it cannot be doubted, that had the vessel been thus moored by the assured, and no capture had intervened, the insurers would not have been liable, on account of the culpable negligence of the master. To hold that the defendants are answerable, in consequence of an act of the captors, so highly culpable and improvident, when the defendants' liability is restricted to the usual peace sea-risks, would, in fact, render them responsible for a risk not a peace-risk.

It is manifest to me, that the leaking of the vessel before the capture, did not render her innavigable; it is not proved, nor can it be pretended, that it did.

Judgment for the defendants.